IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOLORES M. BUCEK, Administratrix of the ESTATE OF MARTIN A. BUCEK, deceased, | ) ) ) ) | 2:22-CV-940-NR |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| ALLEGHENY COUNTY, ORLANDO L. HARPER, LAURA WILLIAMS, and ALLEGHENY HEALTH NETWORK, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION

**J. Nicholas Ranjan, United States District Judge**

Plaintiff Dolores M. Bucek brings this action against Defendants Allegheny County, Allegheny County Jail Warden Orlando Harper, Allegheny County Jail Chief Deputy Warden Laura Williams (together, the "County Defendants"), and Allegheny Health Network (AHN) for the death of her husband, Martin Bucek, while in custody as a pretrial detainee at the Allegheny County Jail (ACJ). Her Section 1983 claims for municipal liability and supervisory liability allege that the County Defendants were deliberately indifferent to Mr. Bucek's vulnerability to suicide. She also brings wrongful-death and survival claims (premised on professional and corporate negligence) against AHN. Defendants now move for summary judgment, arguing that all of the claims fail because there is no evidence that Mr. Bucek's death, by choking on food, was by suicide. After careful review, the Court will grant summary judgment in the County Defendants' favor as to the Section 1983 claims, but will deny summary judgment as to the negligence claims against AHN.

## BACKGROUND

The Court construes the facts here in the light most favorable to Ms. Bucek, who is the non-movant.

## I.    Factual Background

According to ACJ medical records, Mr. Bucek was treated at UPMC Presbyterian Hospital after he attempted to commit suicide by cutting both his wrists with a box cutter on June 18, 2021.  ECF 88-4, p. 69.  On June 22, 2021, he was taken to St. Clair Hospital for treatment for his depression, and sought admission into the psychiatric unit.  *Id*., p. 135; ECF 82-10, p. 1.  After learning that he would not be admitted, he assaulted a staff nurse, resulting in his arrest and discharge to ACJ.  ECF 82-11, pp. 5-6.

### A.    Mr. Bucek's treatment at ACJ from June 24, 2021 through July 2, 2021.

After Mr. Bucek arrived at ACJ, he received a mental-health screening and a mental-health evaluation on June 24, 2021 by Charlotte Porter, a mental-health specialist.  She documented that Mr. Bucek was currently feeling depressed, was diagnosed with bipolar schizoaffective disorder over 20 years ago, had 6 previous suicide attempts (including overdosing on drugs, jumping over a bridge, and stabbing himself in the chest), had been with Pittsburgh Mercy's Community Treatment Team (a community-based program that treats patients with serious mental illnesses) for 13 years, had over 10 inpatient psychiatric admissions, and was taking psychiatric drugs ("Haldol, Vistaril, and something for depression").  ECF 88-4, pp. 149-162.  She also documented that Mr. Bucek did not have any current suicidal ideation or plan, but had a history of command auditory hallucinations, including recent hallucinations telling him to harm himself or others on June 18, 2021 and June 22, 2021.  *Id*., pp. 149, 156, 158, 160.  She did not think that he was a suicide risk, but she did require a psychiatric evaluation.  *Id*., pp. 158, 163.  She recommended

admitting him to Pod 5C (the acute mental health male unit that housed inmates with high suicide risk) on regular observation status, which entailed guard tours every 30 minutes. *Id.*, p. 69; ECF 79-7, 52:8-53:25; ECF 82-4, 32:2-5.

On June 25, 2021, Mr. Bucek was evaluated by Dr. Ann Hammon, a psychiatrist. Dr. Hammon documented that Mr. Bucek had suicidal ideation, but that he had no immediate suicidal plan. ECF 88-4, p. 135. Mr. Bucek reported that he was very depressed, felt hopeless, and had experienced command auditory hallucinations for a long time. *Id.* Dr. Hammon recommended putting him on suicide watch,[1] and also prescribed Lexapro, Haldol, and Vistaril (medications that Mr. Bucek had been taking). *Id.*, pp. 136, 140. At her deposition, Dr. Hammon testified that she put Mr. Bucek on suicide watch because the evaluation was "just loaded with risk factors"—including low self-esteem, history of suicide attempts, and command hallucinations. ECF 79-3, 48:1-14.

Just a day after being placed on suicide watch, Mr. Bucek was seen by Stephen Scharding, a Physician Assistant, who discontinued suicide watch and placed him on regular observation instead. ECF 88-4, pp. 123-128. PA Scharding documented that Mr. Bucek was less depressed, denied any current suicidal ideation, intent, or plans, and agreed to tell staff should they occur, and did not report any agitation or manic

---

[1] Per ACJ suicide-prevention protocols, "suicide watch" actually consists of two different observation levels. An inmate who is "acutely suicidal"—*i.e.*, determined by a qualified healthcare professional to be in imminent danger of committing suicide, actively engaging in self-injurious behavior, or threatening suicide with a specific plan—is placed in an observation cell and is constantly monitored. An inmate who is "non-acutely suicidal"— *i.e.*, expressing current suicidal ideation (expressing a wish to die but without a specific plan) or who has a recent history of self-harm behavior or demonstrates other concerning behavior that may increase their risk of serious injury or death—is observed at staggered intervals not to exceed 15 minutes ("close observation"). ECF 79-2, p. 7; ECF 78-8, pp. 2-3. The mental-health provider determines the appropriate level of observation based on a risk assessment of the inmate. ECF 79-2, p. 7. Dr. Hammon's note doesn't specify what type of suicide watch Mr. Bucek was placed on, but PA Scharding's note suggests that it was "close observation" (staggered 15-minute intervals). ECF 88-4, p. 123.

episodes. *Id.*, p. 123. Mr. Bucek also agreed to increasing his Haldol dosage due to his auditory hallucinations. *Id.*, p. 127. At his deposition, PA Scharding explained that he took Mr. Bucek off suicide watch because Mr. Bucek "told [him] he was doing better," was no longer having suicidal ideations, and "contracted for safety" which meant that "he agreed to tell someone should he become suicidal[.]" ECF 79-12, 33:7-18.

On June 28, 2021, Mr. Bucek was evaluated by Dr. William Fowler, a psychiatrist, after the 5C correctional officer notified mental-health staff that Mr. Bucek was continuously banging on the cell door with his hands, causing bleeding. ECF 88-4, p. 68. Dr. Fowler also documented that he had "swelling of his [right] eye which he is not able to explain." *Id.*, p. 116. Dr. Fowler didn't know if the injury on the right eye was self-inflicted. *Id.* He also recorded Mr. Bucek was having hallucinations that commanded him to harm himself and others, but did not express any suicidal ideation or plan, and that Mr. Bucek "is a danger to self and others." *Id.*, pp. 120-21. Dr. Fowler ordered STAT (emergency) medication for Mr. Bucek's agitation and psychosis. *Id.* At his deposition, he testified that he believed Mr. Bucek's behavior of banging on the door resulted from his agitation, rather than any indication that he was intentionally harming himself or had suicidal intent. ECF 79-5, 27:7-16. He further testified that, at the time he evaluated Mr. Bucek, he "didn't think it made a difference" at that point whether the eye injury was self-inflicted because he was dealing with an "emergency situation" where Mr. Bucek was severely agitated and his purpose there "was to calm [Mr. Bucek] down[,]" and he also had no evidence that the injury was intentional. *Id.*, 42:11-44:11.

On June 29, 2021, Maria Ivona Chrzastowska, a Physician Assistant, documented that she evaluated Mr. Bucek's right eye and bleeding from both ears. ECF 88-4, p. 67. Mr. Bucek (or someone else) reported to her that he had hit his head multiple times on the door, had a self-injury to his right eye from poking it with his

finger, poked a spoon to both ears multiple times, and had "black spots" in his right eye. *Id.* During her deposition, PA Chrzastowska testified that she was only involved in treating Mr. Bucek's medical issues, not his psychiatric issues, because she is part of ACJ's medical department, which is separate from the psychiatry department. ECF 79-8, 22:21-23:22, 44:13-16, 47:7-11.

On July 1, 2021, PA Chrzastowska documented that Mr. Bucek was seen "laying on [the] bunk, sweaty, screaming 'kill me[.]'" *Id.*, p. 66. When asked why he was screaming that, he said "I don't know[.]" Mr. Bucek was also very anxious, shaky, psychotic, and unable to calm down. *Id.* The correctional officer called Thomas Patts, a Physician Assistant, who arrived to perform a psychiatric evaluation of Mr. Bucek. *Id.*, p. 111.

PA Patts documented that Mr. Bucek was "sweating profusely," shirtless, and pacing in his cell. *Id.* Mr. Bucek said that he wanted to leave the jail. *Id.* PA Patts further documented that, based on reviewing the records and discussing with staff, the eye injury was self-inflicted; PA Patts offered Mr. Bucek medication to calm him, and medication was administered. *Id.* PA Patts noted no suicidal ideation or plan. *Id.*, p. 114. Later that day, Vincent O'Reilly, a mental-health registered nurse, documented that there was no further self-harm behavior, Mr. Bucek took his medication, and when asked how he felt, Mr. Bucek said "[m]uch better[.]" *Id.*, p. 65.

On July 2, 2021, Mr. Bucek had to be forcefully medicated by injection, but there aren't any medical notes from this date. ECF 78-1, p. 9 (police interview report of Sergeant Michael Gillespie). That said, ACJ medical records indicate that Mr. Bucek had refused his prescribed medications on several dates: June 28, 2021, July 2, 2021, and the morning of July 3, 2021. ECF 88-4, pp. 70-72.

**B.    Mr. Bucek's treatment and death at ACJ on July 3, 2021.**

On July 3, 2021 at 7:40 a.m., PA Chrzastowska documented that Mr. Bucek was seen screaming in his cell all morning, and was "unable to communicate at

present." *Id.*, p. 65. Mr. Bucek had been scheduled for an offsite optometry appointment, but this was cancelled because of his unpredictable behavior, paranoia, psychosis, suicidal/homicidal ideations, and self-injuries. *Id.*

At 3:15 p.m., Correctional Officer Andrew Ruffner (who began his shift at 2:46 p.m.) found and removed a tray and spoon from Mr. Bucek's cell.[2] ECF 82-4, 15:19-25, 17:8-10. Officer Ruffner testified that Mr. Bucek "was not mentally stable" and was talking incoherently, "was very all over the place and to the point where…[Officer Ruffner] did say something to the mental health nurse about him not being okay in that cell." *Id.*, 18:25-19:5. Officer Ruffner asked the nurse, RN O'Reilly, about the next steps of Mr. Bucek's treatment. *Id.*, 19:8-20:4.

At 3:42 p.m., RN O'Reilly (who started his shift at around 2:00 p.m.) documented that Mr. Bucek had been yelling and screaming, was extremely agitated and crying, and refusing all medication. ECF 79-13, 35:8; ECF 88-4, p. 64. So he called the doctor and got an order for a forced Haldol/Benadryl injection. ECF 79-13, 35:8-18. At his deposition, RN O'Reilly testified that he got the order for the injection because Mr. Bucek's "agitation was really bad" and "[h]e was having a horrible time"—"[e]xtreme agitation, banging, yelling, screaming, standing at the door, just really having a psychotic event." *Id.*, 35:8-18, 57:21-25. RN O'Reilly testified that Mr. Bucek's behavior—yelling, screaming, extreme agitation, crying, refusing his medication—did not warrant suicide watch, and instead, he tried to "de-escalate [Mr. Bucek] by medications." *Id.*, 58:23-59:7.

---

[2] Officer Ruffner testified that July 3, 2021 is the first time that he interacted with Mr. Bucek, so he wouldn't have known Mr. Bucek was previously on suicide watch. ECF 82-4, 14:12-15:18 ("[T]here's typically no communication on, hey, this person was on suicide watch earlier that week, keep an eye on them."). Officer Ruffner testified that the tray and spoon were prohibited in the mental health unit cells; he assumed that they hadn't been collected earlier because Mr. Bucek had refused to give them back. *Id.*, 17:8-18:13.

RN O'Reilly then went to the nursing station to prepare the medication and wait for the SERT team, which was a group of correctional officers assembled to assist with forced medications; the SERT team included Officer Ruffner and Sergeant Gillespie. *Id.*, 38:3-9, 42:10-16, 51:2-12; ECF 82-4, 25:1-7.

Officer Ruffner recalls seeing Mr. Bucek alert at every single one of his guard tours from 3:15 p.m. to 5 p.m., though he wasn't able to communicate with Mr. Bucek given his mental state. *Id.*, 20:5-13, 21:10-22:17. According to the police report, at his 5 p.m. tour, Officer Ruffner saw Mr. Bucek screaming incoherently, which Officer Ruffner described as "normal behavior" for Mr. Bucek. ECF 78-1, p. 3. At his deposition, Officer Ruffner recalled that, at his 5 p.m. tour, Mr. Bucek's behavior was the same as it had been for the previous two hours on the shift, *e.g.*, standing by the cell door and talking incoherently. ECF 82-4, 21:17-22:11.

About ten minutes later, the SERT team assembled at the nursing station. ECF 88-1, p. 16. Sergeant Gillespie testified that, when he arrived at the unit after being notified by Officer Ruffner, he saw Mr. Bucek agitated and yelling by/hitting the cell door at around 5:10 p.m. ECF 82-5, 22:13-23. He didn't want to go near Mr. Bucek's cell door to increase his agitation, so he "kept distance and observed." *Id.*, 48:24-49:2.

At around 5:14 p.m., the SERT team and RN O'Reilly approached Mr. Bucek's cell to administer the forced medication, but found Mr. Bucek unresponsive, lying face down on the mattress. ECF 78-1, p. 3; ECF 82-2, p. 3. RN O'Reilly started CPR and cleared his airway because there was food (noted to be sandwich or bread remains) in his mouth. ECF 79-13, 44:11-45:23; ECF 78-1, p. 3. Other medical staff arrived with a crash cart and began more aggressive life-saving measures. ECF 79-13, 56:1-6. EMS arrived on scene around 5:25 p.m. ECF 78-1, p. 3. Mr. Bucek was transported to Mercy Hospital, and was pronounced dead at around 6:00 p.m. en route to the hospital. ECF 88-6, p. 3.

The medical examiner determined that Mr. Bucek died from "asphyxia due to airway obstruction by food bolus." ECF 82-1, p. 3 (Autopsy Report and Postmortem Toxicology Report).

To summarize, below is a timeline of the treatment that Mr. Bucek received throughout his short stay at ACJ:

| Date | Treatment |
|------|-----------|
| June 24, 2021 | Mr. Bucek received a mental-health evaluation by mental-health specialist Charlotte Porter, who recommended admission into the acute mental health unit. |
| June 25, 2021 | Mr. Bucek was placed on suicide watch by Dr. Hammon. |
| June 26, 2021 | Mr. Bucek was taken off suicide watch after an evaluation by PA Scharding. PA Scharding increased his Haldol dosage due to his auditory hallucinations. |
| June 28, 2021 | Mr. Bucek was evaluated by Dr. Fowler for his behavior (banging continuously on the cell door) and his eye injury. Dr. Fowler ordered emergency medication. |
| June 29, 2021 | PA Chrzastowska treated Mr. Bucek's self-inflicted eye and ear injuries and documented his erratic behavior. |
| July 1, 2021 | PA Patts evaluated Mr. Bucek for his self-inflicted injuries and psychotic behavior (screaming "kill me"). PA Patts ordered medication to calm him down. |
| July 3, 2021 | RN O'Reilly ordered an emergency forced injection because Mr. Bucek was screaming, extremely agitated, crying, and refusing all medication. Mr. Bucek was found unresponsive before the medication could be administered. |

## II.    Procedural Background

On June 28, 2022, Ms. Bucek filed this lawsuit, on behalf of her husband's estate, against the County Defendants under Section 1983 for violations of the Fourth, Eighth, and Fourteenth Amendments. ECF 1. On September 27, 2022, Ms. Bucek filed the First Amended Complaint, adding AHN as a party and bringing survival and wrongful-death actions against AHN for corporate and professional

negligence.[3]  ECF 12.  She filed amended complaints three times thereafter.  ECF 20, ECF 33, ECF 38.  At the motion-to-dismiss stage, the Court denied Defendants' motions to dismiss the Fourth Amended Complaint, and so this is the operative complaint.  ECF 54.

The Fourth Amended Complaint brings seven separate claims.

- *Monell* claim against Allegheny County for deliberate indifference to Mr. Bucek's particular vulnerability to suicide (Count I);

- Section 1983 supervisory-liability claim against Warden Harper (Count II);

- Section 1983 supervisory-liability claim against Chief Deputy Warden Williams (Count III);

- Professional negligence survival action against AHN (Count IV);

- Professional negligence wrongful-death action against AHN (Count V);

- Corporate negligence wrongful-death action against AHN (Count VI); and

- Corporate negligence survival action against AHN (Count VII).

Following extensive fact and expert discovery, Defendants moved for summary judgment.  ECF 76 (County Defendants), ECF 80 (AHN).  The motions have been fully briefed, and are now ready for disposition.

---

[3] Warden Harper testified that AHN, as the contracted provider for ACJ, provided the physicians and the PAs; the other medical staff were employed by ACJ.  ECF 79-11, 17:17-18:3.  Ms. Bucek avers that Dr. Hammon, Dr. Fowler, PA Scharding, and PA Chrzastowska were employed by AHN.  ECF 85, p. 2.

## DISCUSSION & ANALYSIS[4]

I. **The Court will grant summary judgment in favor of the County Defendants as to Counts I-III of the complaint.**

Counts I-III of the Fourth Amended Complaint assert the constitutional violation of deliberate indifference to Mr. Bucek's particular vulnerability to suicide. ECF 38. Count I specifically is a *Monell* claim against Allegheny County, while Counts II and III are derivative supervisory-liability claims against the Warden and Chief Deputy Warden. The crux of all these claims is that deficiencies in ACJ's policies, customs, and practices led to Mr. Bucek's death. ECF 84, p. 8.

As discussed below, the Court will grant the County Defendants' motion for three reasons. First, there is insufficient evidence of a constitutional violation: the ACJ staff's actions (or lack thereof) don't rise to the high level of deliberate indifference to Mr. Bucek's particular vulnerability to suicide. Second, the claims fail because there isn't enough evidence that the allegedly deficient policies, customs, and practices at issue were the "moving force" behind Mr. Bucek's death. Third, as to the supervisory-liability claims specifically, those fail because there is insufficient

---

[4] Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

If the moving party shows a lack of genuine issue of material fact, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is appropriate. *Celotext Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

evidence of any personal involvement of Warden Harper and Chief Deputy Warden Williams.

> **A.    Ms. Bucek has failed to provide sufficient evidence of an underlying constitutional violation.**

A Section 1983 claim for deliberate indifference to a pretrial detainee's particular vulnerability to suicide under the Fourteenth Amendment requires "(1) that the person who committed suicide had a particular vulnerability to suicide; (2) that the custodial official knew or should have known about; and (3) that the custodial official acted with deliberate or reckless indifference to the person's particular vulnerability."[5] *Diorio v. Harry,* No. 21-1416, 2022 WL 3025479, at *3 (3d Cir. Aug. 1, 2022).  Ms. Bucek must provide sufficient evidence to establish all three prongs to bring a Fourteenth Amendment claim.  She cannot do so.

Specifically, Ms. Bucek's claim fails on the third prong: deliberate indifference. That is, even assuming that Mr. Bucek had a particular vulnerability to suicide and that ACJ staff knew or should have known about it, the Section 1983 claims fail because there is no evidence that the County Defendants acted deliberately indifferent.

"Deliberate indifference requires that prison officials know of an excessive risk to an inmate's health or safety and affirmatively disregard that risk." *Est. of Kempf*

---

[5] Ms. Bucek also argues in her briefs that the failure to provide appropriate psychiatric care to Mr. Bucek constitutes "deliberate indifference to his serious medical needs."  ECF 84, p. 22.  This theory of liability was not explicitly pled in the Fourth Amended Complaint, but a vulnerability-to-suicide claim is just a subset of Section 1983 claims based on deliberate indifference to a prisoner's serious medical needs.  *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017); *see also Glantz v. Montgomery Cnty.*, No. 22-3868, 2024 WL 3460111, at *8 (E.D. Pa. July 17, 2024) ("A deliberate indifference to serious medical need analysis is nearly identical to a deliberate indifference to a particular vulnerability to suicide analysis.").  Regardless of how the constitutional violation is framed, Ms. Bucek has failed to present sufficient evidence of any deliberate indifference.

*v. Washington Cnty.*, No. 15-1125, 2018 WL 4354547, at *18 (W.D. Pa. Sept. 12, 2018) (Conti, C.J.) (cleaned up); *see also Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) ("To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." (cleaned up)); *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314 (3d Cir. 2005) ("[T]here can be no reckless or deliberate indifference to [the risk of suicide] unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." (cleaned up)).

Ms. Bucek argues that, despite ACJ staff's awareness of Mr. Bucek's prior suicide attempts and mental-health history, and his self-injurious behavior and deteriorating mental state while at ACJ, they failed to provide sufficient mental-health treatment or consistently address his mental-health needs; she argues that "[t]he failure to monitor and ensure that he received appropriate psychiatric care while in custody constitutes deliberate indifference to his serious medical needs." ECF 84, pp. 21-22. She specifically points to the failure to place Mr. Bucek back on a higher level of observation status (including on the day of his death) and the failure to constantly monitor him after emergency psychiatric medication was ordered on July 3, 2021, but before it was administered. *Id.*, p. 23. The crux of the alleged deliberate indifference is ACJ's failure to provide adequate care.

The law is clear that deliberate indifference is a standard much higher than mere negligence. "Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners. . . .Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Palakovic*, 854 F.3d at 227-28 (cleaned up). "Simple disagreement about the proper course of

medical treatment is insufficient to establish deliberate indifference." *Est. of Kempf*, 2018 WL 4354547, at *17.

But "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements[,]" such as where prison officials "opt for an easier and less efficacious treatment of the inmate's condition[,]" where prison officials "deny reasonable requests for medical treatment when such denial exposes the inmate to undue suffering[,]" where prison officials know of the need for medical care but intentionally refuse to provide it, where a treatment decision is such a "substantial departure from accepted professional judgment, practice, or standards" that a jury could conclude the medical staff didn't actually base the treatment decision on such a judgment, and where "necessary medical treatment is delayed for non-medical reasons[.]" *Palakovic*, 854 F.3d at 228 (cleaned up); *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538-39 (3d Cir. 2017) (cleaned up).

Construing the facts in Ms. Bucek's best light, the record doesn't show that ACJ staff acted with deliberate indifference, *e.g.*, more than "a negligent failure to protect [Mr. Bucek] from self-inflicted harm[.]" *Woloszyn*, 396 F.3d at 321 (cleaned up). This is not a case where prison officials intentionally refused to provide medical care, or provided less efficacious treatment despite knowing of a high risk of suicide. Instead, the record shows that Mr. Bucek's "overall condition was taken seriously during his incarceration[,]" and that "[h]e was seen by [mental health staff] the days leading up to [his death] and hours before" his death. *Est. of Watson v. Cumberland Cnty.*, No. 16-6578, 2020 WL 104068, at *9 (D.N.J. Jan. 9, 2020). He received a mental health screening and evaluation when he arrived at ACJ, then was placed on suicide watch a day later by Dr. Hammon. He then received several psychiatric evaluations, from PA Scharding, Dr. Fowler, and PA Patts, and was consistently attended to by the mental health staff, including RN O'Reilly, leading up to his death on July 3, 2021.

This extensive and frequent medical treatment—even if wrong—undercuts any showing of deliberate indifference.  *See Freitag v. Bucks Cnty.*, No. 19-05750, 2022 WL 2703599, at *8 (E.D. Pa. July 12, 2022) (while extensive medical encounters—meeting with mental healthcare providers 19 times over just three months—"do not preclude a finding of deliberate indifference[,] . . . such extensive medical [en]counters certainly make it more difficult for a reasonable jury to infer deliberate indifference"); *McGough v. Marion Cnty.*, No. 06-364, 2008 WL 2073907, at *14 (M.D. Fla. May 14, 2008) (no deliberate indifference based on jail staff prescribing the wrong anti-psychotic medications, failing to constantly supervise inmate, or providing inmate access to psychiatrist on a more frequent basis).

Ms. Bucek takes issue with PA Scharding's "inexplicabl[e]" decision to remove Mr. Bucek from suicide watch, less than 24 hours after Dr. Hammon placed him on it.  ECF 84, p. 10.  Again, this may reflect bad judgment, but "an *incorrect* or *negligent* medical judgment . . . alone does not give rise to deliberate indifference."  *Est. of Thomas v. Fayette Cnty.*, 194 F. Supp. 3d 358, 373 (W.D. Pa. 2016).  PA Scharding documented that he discussed treatment options with Mr. Bucek; that Mr. Bucek agreed to increase his Haldol dosage, take his medications as prescribed, and tell staff if he developed any suicidal ideations; and that Mr. Bucek would stay in 5C for observation and be reevaluated within a week, per 5C protocol, or sooner if his symptoms exacerbated.  ECF 88-4, p. 127.  Ms. Bucek hasn't shown that PA Scharding's decision to take Mr. Bucek off suicide watch "was based on anything other than his professional judgment"—and PA Scharding would have reason to believe that Mr. Bucek would be treated by other mental health staff if necessary. *Markowitz v. Nicholson*, No. 23-1691, 2023 WL 6241244, at *2 (3d Cir. Sept. 26, 2023). "In fact, [Mr. Bucek] was subsequently seen" by other mental-health providers. *Lawniczak v. Cnty. of Allegheny*, 811 F. App'x 743, 747 (3d Cir. 2020); *see also Pearson*, 850 F.3d at 542-43 (doctor's order to send inmate directly back to the general

prison population without any observation period in the prison infirmary didn't amount to deliberate indifference to his medical needs because this involved "mere disagreement as to the proper medical treatment" (cleaned up)).

The same goes for the mental-health staff's failure to put Mr. Bucek back on suicide watch—including on July 3, 2021, the day of his death—after learning about his erratic behavior (poking his eye, sticking a spoon into his ears, and banging his head and hands against the door), psychosis, agitation, screaming "kill me," and the cancellation of his offsite optometrist appointment on the morning of July 3, 2021 because of his erratic behavior. Following these incidents, Mr. Bucek was evaluated by mental-health providers who did not observe suicidal ideations, and thus, did not believe suicide watch was warranted. Dr. Fowler recognized that Mr. Bucek was a danger to himself and others, but believed that his behavior resulted from his agitation rather than from suicidal intent. PA Patts treated Mr. Bucek's psychosis, agitation, and self-harm behavior by administering medication, and this attempted de-escalation seemingly worked because when asked how he felt later that day, Mr. Bucek said "much better." RN O'Reilly ordered forced medication to de-escalate Mr. Bucek's extreme agitation and psychosis, because he was neither vocalizing suicidal ideations nor attempting to harm himself. ECF 79-13, 58:1-59:7. These treatment decisions do not reflect deliberate indifference, and the mental health staff took measures to address Mr. Bucek's observed agitation and self-inflicted injuries by prescribing emergency medication to calm him down. *See Alexander v. Monroe Cnty.*, No. 13-01758, 2016 WL 7104313, at *7 (M.D. Pa. Dec. 6, 2016) (plaintiff didn't show reckless indifference by failing to place inmate on suicide watch or providing adequate suicide prevention measures because "[w]hat the evidence does portray is [prison doctor] providing [inmate] with attentive medical care for nearly two-and-a-half-months and throughout this period, [inmate] consistently denying, and the medical professionals evaluating, [inmate] as not having any suicidal or homicidal

- 15 -

ideations"), *aff'd*, 734 F. App'x 801, 805 (3d Cir. 2018) ("Evaluations of [inmate] for more than two months thereafter reflected there was no suicidal ideation, and during times when [inmate] expressed anxiety or other symptoms, his medication was adjusted and monitored."); *Freitag*, 2022 WL 2703599, at *9 (mental healthcare providers' responses to inmate's evaluations "were not so discordant with the information they received so as to support an inference of deliberate indifference").

The failure to constantly monitor Mr. Bucek in the approximately 1.5 hours after emergency psychiatric medication was ordered on July 3, 2021 doesn't constitute deliberate indifference, when considered in the context of the consistent psychiatric attention that Mr. Bucek did receive, including from RN O'Reilly shortly before his death.[6] "This case does not involve a complete delay or denial of care[,]" and there is no evidence that the delay in administering medication was based on non-medical factors, *i.e.*, "a desire to punish, to lessen the workload or to save a prison money." *Michaux v. Temas*, No. 17-01241, 2020 WL 3799755, at *16 (W.D. Pa. July 7, 2020) (Conti, J.) (cleaned up) ("Although plaintiffs attempt to characterize the

---

[6] Nor is there evidence of deliberate indifference by the correctional officers who attended to Mr. Bucek the day of his death. Officer Ruffner, noticing Mr. Bucek's erratic behavior and talking incoherently, alerted RN O'Reilly to Mr. Bucek's behavior and asked about his treatment. ECF 82-4, 19:8-22. Sergeant Gillespie noticed Mr. Bucek's agitation shortly before his death, but testified that he wasn't aware that Mr. Bucek had previously been on suicide watch, nor was he aware of his previous suicide attempts, mental health diagnosis, or self-harming behavior while in 5C. ECF 82-5, 18:3-19:11. Both Officer Ruffner and Sergeant Gillespie could defer to mental health staff's (specifically, RN O'Reilly's) medical judgment about what treatment Mr. Bucek needed. *See Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."); *Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 112 (3d Cir. 2007) ("[N]on-physician defendants cannot be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison's medical staff." (cleaned up)).

postponements of the follow-up appointment as a denial of care, it is undisputed that [inmate] was receiving medical and psychiatric attention. . . .The lack of an explanation for a treatment delay . . . does not necessarily mean that the delay was motivated by non-medical reasons."); *see also Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 112 (3d Cir. 2007) (no indication of deliberate indifference by mental health counselor who "engaged in a good-faith clinical assessment" of inmate's symptoms, but concluded on several visits that his condition did not warrant referral to a psychiatrist for medications).

In sum, Ms. Bucek hasn't put forth sufficient evidence that the mental health-staff's medical treatment amounted to deliberate indifference—and that, specifically, the decision to take him off suicide watch and not put him back on it reflected deliberate indifference.  For these reasons, the claim against the County Defendants fails.[7]

---

[7] Ms. Bucek relies on Dr. Ann Natasha Cervantes's expert opinion, which criticizes the staff's failure to increase Mr. Bucek's observation status after observing his self-injurious and erratic behavior, including on the day of his death when he was described as extremely agitated and psychotic.  ECF 84, p. 27.  Dr. Cervantes opines on the various ways in which the mental health staff's treatment of Mr. Bucek fell below the standard of care.  ECF 88-1, pp. 34-38.  This expert opinion is evidence and might create a dispute of fact as to the question of negligence; but it doesn't create one on the question of deliberate indifference.  *See Alexander v. Monroe Cnty.*, 734 F. App'x 801, 805 (3d Cir. 2018) ("While the reports of appellant's expert express a difference of opinion as to whether [inmate] should have been removed from suicide watch during his incarceration, those reports do not reasonably support a finding that [the psychiatrists] were deliberately indifferent to [inmate's] alleged particular vulnerability to suicide. Nor does the suggestion of appellant's expert that [inmate's] suicide could have been prevented by leaving him on Level I suicide watch support a finding of reckless or deliberate indifference."); *Green v. Coleman*, 575 F. App'x 44, 48 (3d Cir. 2014) (no deliberate indifference where inmate received some amount of medical attention, and merely disagreed with its type and quantity).

**B.    Because there is no evidence that Mr. Bucek died by suicide, the suicide-risk policies cannot serve as the basis for any *Monell* liability.**

There is a second independent reason that the claims here fail: there is a disconnect between the policies at issue and Mr. Bucek's cause of death.

"[A] § 1983 claim against a municipality may proceed in two ways. A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice[.]" *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up) (distinguishing "policy-and-custom" claims premised on an allegedly unconstitutional policy or custom from "failure-or-inadequacy" claims, which include allegations of failure to train, supervise, or discipline).

Regardless of whether a plaintiff asserts a facially unconstitutional policy or custom, a policy deficiency or inadequacy, or a failure to train employees, there must be a causal nexus with the constitutional injury suffered by the plaintiff. *See Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) ("A plaintiff seeking to hold a municipality liable under section 1983 must demonstrate that the violation of rights was caused by the municipality's policy or custom. Liability is imposed when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the moving force behind the constitutional tort of one of its employees." (cleaned up)); *Est. of Thomas*, 194 F. Supp. 3d at 381 ("[T]here is not a factual basis from which a jury could conclude that any of the allegations underlying the municipal liability or 'failure to' claims actually *caused* [inmate's] alleged constitutional harm—allowing him to commit suicide."); *Colburn*, 946 F.2d at 1030 (failure-to-train theory requires a plaintiff to "identify a failure to provide specific training that has a causal nexus with his or her injury" and to show that "the failure

to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur"). Moreover, "[w]ithout an underlying [constitutional] violation, [Ms. Bucek] cannot demonstrate a direct causal link between the policy or custom and [Mr. Bucek's] death." *Est. of Allen v. Cumberland Cnty.*, No. 15-6273, 2020 WL 3468180, at *8 (D.N.J. June 25, 2020) (cleaned up).

Ms. Bucek, relying on Dr. Cervantes's expert opinion, argues that ACJ's policies on suicide prevention and intervention, mental health screening and treatment, and emergency use of forced psychotropic medication were deficient and resulted in deliberate indifference to Mr. Bucek's particular vulnerability to suicide, including by not requiring staff to monitor an inmate prior to emergency psychiatric medication being administered. ECF 84, p. 32; *see* ECF 78-8 (Jail Policy 304, Suicide Behavior Detection, Prevention, and Care), ECF 78-9 (Jail Policy 305, Mental Health Screening and Commitments), ECF 79-1 (Jail Policy 2704, Emergency Psychotropic Medication), ECF 79-2 (Jail Policy 2211, Suicide Prevention and Intervention Program).

Ms. Bucek also proceeds on a failure-to-train theory, that the County Defendants failed to train and instruct staff on how to properly assess and monitor Mr. Bucek, including failure to train them on: (1) indicators of suicidal behavior, (2) how medical staff should respond to "observed self-inflicted injuries and verbalized suicidal ideations," (3) "appropriate response time to administration of emergency psychiatric medications," (4) "how to handle situations where the inmate requires further immediate mental health attention[,]" and (5) specifically for ACJ's contracted medical providers (Dr. Hammon and Dr. Fowler), training them on ACJ's policies. ECF 84, p. 31.

But Ms. Bucek has not shown that Mr. Bucek's injury was actually caused by any of the asserted deficient policies, customs, or practices. Specifically, there is no

evidence that Mr. Bucek's death was by suicide or intentional self-harm.[8]  The medical examiner only determined that Mr. Bucek died from "asphyxia due to airway obstruction by food bolus."  ECF 82-1, p. 3.  And not even Dr. Cervantes opines that his death was by suicide; she instead opines that whether the choking was intentional or accidental is inconsequential because suicide watch is the "only appropriate level of observation for individuals who are highly agitated and assessed as being at high risk for self-harm" and the fact that staff "failed to recognize the need for" suicide watch "allowed Mr. Bucek to be left alone to choke and die in his cell."  ECF 88-3, p. 4.  *See Flores v. Camden Cnty. Dep't of Corr.*, No. 21-09120, 2025 WL 33068, at *4 (D.N.J. Jan. 6, 2025) (finding that plaintiffs couldn't establish deliberate indifference to inmate's vulnerability to suicide where "there is no evidence that [inmate] died by suicide"); *McGough*, 2008 WL 2073907, at *13  (plaintiff failed to establish "a strong likelihood that [inmate] would commit suicide specifically by choking on his lunch meal" where there was no evidence that inmate "did, in fact, commit suicide; the medical examiner determined that [inmate's] death was accidental, and Plaintiff's own expert witnesses cannot agree as to whether this choking was accidental or intentional" (cleaned up)).

It isn't enough that, as Dr. Cervantes opines, ACJ staff would have seen Mr. Bucek choking on food and intervened on time if he had been constantly watched—

---

[8] Ms. Bucek points to her testimony that she believed that Mr. Bucek's death was by suicide because of his previous suicide attempts.  ECF 82-7, 29:4-16; ECF 85, p. 30. But her belief is speculative and doesn't create a genuine dispute of fact.  Indeed, Ms. Bucek's testimony reveals that she knew little about his mental health treatment after their divorce in 2005, besides what Mr. Bucek had told her about his mental health condition and his suicide attempts.  *See* ECF 82-7, 23:2-24 (testifying that she didn't know how often he was hospitalized for a mental health condition after their divorce), 52:23-53:4 (testifying that she wasn't aware of any mental health stays after their divorce or that he was being treated by Mercy's Community Treatment Team); 58:4-11 (testifying that the last time she spoke with Mr. Bucek before his death was 3 or 4 months prior to).

constant monitoring might have prevented *any* death, including an accidental death. Without evidence that Mr. Bucek intentionally choked to death (or even that a person with mental health illnesses like Mr. Bucek is more likely to accidentally choke on food, such that the staff should have known of a strong likelihood he would choke on food), the policies on suicide prevention, mental health treatment, and forced psychotropic medication—which are intended to identify and treat inmates who are at risk of committing suicide or inflicting self-harm—are irrelevant to the Section 1983 claims, and the alleged deficiencies in these policies (as well as the alleged failure to train staff on suicide prevention) could not have been the moving force behind Mr. Bucek's death.

Put differently, Mr. Bucek's death was not a foreseeable consequence of the alleged deficiencies in the suicide prevention policies or the failure to train staff on suicide prevention. *See* ECF 77, p. 13 ("In the absence of a substantial reason for any defendant to know of a substantial risk that [Mr.] Bucek would choke while eating, they cannot be found to have been deliberately indifferent to that risk."); *Kelley v. Bradford Cnty.*, No. 07-1531, 2010 WL 1136313, at *8 (M.D. Pa. Mar. 23, 2010) (plaintiff's argument about inadequate suicide prevention policies fails because "it relies on a relaxed standard of causation that is appropriate in negligence actions, but not civil rights actions based upon the alleged deliberate indifference of a state actor to a substantial risk of harm to Plaintiff" and "[a]bsent competent proof that the alleged violation of a constitutional right proximately caused the injury for which damages are claimed, no recovery is possible").

Because Ms. Bucek has established neither a constitutional violation nor causation, the *Monell* claim in Count I of the complaint fails.

### C.    The supervisory-liability claims against Warden Harper and Deputy Warden Williams fail for the same reasons, and for lack of any evidence of their personal involvement.

Counts II and III are the derivative supervisory-liability claims against Warden Harper and Deputy Warden Williams.    Supervisory liability can be established in either of two ways: "(1) when the supervisor, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the harm; or (2) when the supervisor participated in violating the plaintiff's rights, directed others to violate them, or as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Wehrli v. Allegheny Cnty.*, No. 16-977, 2017 WL 1233619, at *7 (W.D. Pa. Apr. 4, 2017) (Eddy, M.J.) (cleaned up).  Ms. Bucek has not presented sufficient evidence to proceed under either theory.

First, it appears that Ms. Bucek is proceeding under the first theory of supervisory liability, claiming that these Defendants were responsible for implementing and promulgating mental healthcare policies and for training staff on suicide prevention and mental healthcare, and that their failure to train or correct deficient policies amounted to deliberate indifference to the risk of a constitutional violation.  ECF 84, pp. 34-35.  As such, the supervisory-liability claims fail for the same reasons that the municipal-liability claim fails.  *Cf. Michaux*, 2020 WL 3799755, at *22 (dismissing municipal liability claim where it was identical to the supervisory liability theory, which was also dismissed); *Ferencz v. Medlock*, No. 11-1130, 2014 WL 3339639, at *6 (W.D. Pa. July 8, 2014) (McVerry, J.) (supervisor may be liable for reasons municipal-liability claim survived summary judgment).

Second, to the extent that Ms. Bucek might try to proceed under the second theory of supervisory liability, there is insufficient evidence to get to a jury on that theory.  That is, Ms. Bucek has not pointed to any evidence that either Warden

Harper or Deputy Warden Williams were personally involved in Mr. Bucek's treatment at ACJ, or was even aware of Mr. Bucek prior to his death (let alone aware of his suicidal tendencies).  ECF 84, pp. 30-31; ECF 79-7, 60:24-61:2 (Deputy Warden Williams testifying that she was not involved in his care); ECF 79-11, 53:1-4 (Warden Harper testifying that he is not alerted when an inmate is taken off or placed on suicide watch).  Without such evidence, the supervisory-liability claims must be dismissed.

## II.    The Court will deny AHN's motion for summary judgment because there are triable facts on the question of negligence.

At Counts IV-VII of the complaint, Ms. Bucek brings survival and wrongful-death actions for professional and corporate negligence against AHN.  "Under Pennsylvania law, claims of negligence against a health care provider are claims of medical malpractice[,]" which require that: "1) the medical practitioner owed a duty to him; 2) the practitioner breached that duty; 3) the breach was the proximate cause of, or a substantial factor in, bringing about the harm that that he suffered; and 4) the damages suffered were the direct result of the harm." *Kinney v. Cnty. of Berks*, No. 22-2566, 2025 WL 270055, at *15 (E.D. Pa. Jan. 21, 2025) (cleaned up).  "In the typical malpractice case, the duty of care, or the standard of practice to which the defendant-practitioner failed to adhere, must be established by expert testimony." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 579 (3d Cir. 2003) (cleaned up).

A healthcare corporation such as AHN that provides medical services to prison inmates may be held liable under a corporate negligence theory.  *McDonald-Witherspoon v. City of Philadelphia*, 481 F. Supp. 3d 424, 453 (E.D. Pa. 2020) (organizations contracted to provide medical services to inmates can be held liable under corporate negligence theory, which "arises from the policies, actions or inaction of the [organization] itself rather than the specific acts of individual hospital employees" (cleaned up)).  A prima facie case of corporate negligence requires a

showing that "(1) [AHN's] actions deviated from an accepted medical standard; (2) [AHN] had actual or constructive knowledge of the defect or procedures that created the harm; and (3) [AHN's] negligence was a substantial factor in causing the harm." *Davis v. Corizon Health, Inc.*, No. 14-1490, 2015 WL 518263, at *4 (E.D. Pa. Feb. 9, 2015) (cleaned up) (noting that claims for health care corporation's "failure to supervise and retain competent medical staff . . . are cognizable as corporate negligence").

Ms. Bucek asserts that AHN had a duty to ensure that the medical staff who treated Mr. Bucek complied with the "proper administration of medication and the proper medical response to erratic behavior and suicidal intentions." ECF 38, ¶ 118; ECF 85, p. 11. AHN does not dispute the "duty" element, but focuses on breach and causation. *See* ECF 81, p. 11.

To begin with, AHN argues that, since there is no evidence that Mr. Bucek died by suicide, Ms. Bucek cannot prove that any alleged failure by AHN and its providers, *i.e.*, to give him adequate medical attention or supervision for any potential suicide attempts, was the proximate cause of (or a substantial factor in) his death. *Id.*, p. 2.

While there isn't sufficient evidence that Mr. Bucek died by suicide, the Court finds that the issue of proximate cause may proceed to a jury. The fact that Mr. Bucek may have accidentally choked to death is not fatal to bringing a negligence claim for AHN providers' failure to provide adequate medical care. *See McGough*, 2008 WL 2073907, at *16 (allowing state-law negligence claims to proceed to trial based on factual disputes of whether inmate received reasonable care for his mental illness, despite no evidence that inmate did in fact commit suicide); *McDonald-Witherspoon*, 481 F. Supp. 3d at 438, 452 (allowing medical negligence claim to proceed based on inmate's psychiatric treatment, despite no evidence that inmate actually committed suicide).

Based on the record, a jury could reasonably infer that Mr. Bucek's accidental death by choking stemmed from his erratic behavior associated with his mental health conditions or illness—including his erratic behavior throughout the day of his death.  The morning of his death, PA Chrzastowska documented that Mr. Bucek was seen screaming in his cell all morning, and "unable to communicate at present" and that his offsite optometry appointment had to be cancelled because of his unpredictable behavior, paranoia, psychosis, suicidal/homicidal ideations, and self-injuries.  ECF 88-4, p. 65.   At around 3:15 p.m., Officer Ruffner noticed that Mr. Bucek "was not mentally stable," was talking incoherently, and was "all over the place[.]"  ECF 82-4, 18:25-19:5.  At around 3:42 p.m., Mr. Bucek, as documented by RN O'Reilly, was yelling and screaming, extremely agitated and crying, refusing all medication, and having a psychotic event.  ECF 88-4, p. 64; ECF 79-13, 35:8-18, 57:21-25.  At around 5:10 p.m., Mr. Bucek was still agitated and yelling and hitting the cell door.  ECF 82-5, 22:22-23:1.  At around 5:14 p.m., he was found unresponsive.  ECF 78-1, p. 3.  This timing, combined with his choking on food bolus, is enough to infer a connection between the alleged medical negligence and Mr. Bucek's death.

The Court further finds that Dr. Cervantes's expert opinion creates a triable issue on whether AHN providers breached the standard of care in their medical treatment of Mr. Bucek, with regards to the failure to ensure proper administration of medication.[9]  Specifically, as to the administration of medication, she opines that: (1) Dr. Hammon failed to order Abilify (one of his long-acting antipsychotics he received every three weeks) or an appropriate substitute; (2) even after Abilify was belatedly ordered, it was never administered to Mr. Bucek prior to his death (based on the postmortem report); and (3) Mr. Bucek's worsening symptoms, despite an

---

[9] Dr. Cervantes also opines that AHN providers' treatment was deficient in some respects as to suicide prevention.  ECF 88-1, pp. 34-36.  However, because there isn't sufficient evidence that Mr. Bucek committed suicide, Ms. Bucek will not be allowed to proceed at trial on a negligence claim predicated on any type of suicide prevention.

increase in his Haldol dose on June 26, 2021, should have prompted a provider to order crushed/floated medication, or another form of medication, and closer nursing supervision when medication was being administered (because, based on the postmortem report, Mr. Bucek didn't have detectable metabolites for Haldol in his blood, which indicates he was not actually swallowing all the medication documented as administered).  ECF 88-1, pp. 34-35.

Dr. Cervantes's opinion creates a triable issue on whether the AHN providers' failure to prescribe and administer medication appropriately contributed to Mr. Bucek's death; a jury could find that this contributed to his decompensation, worsening psychotic symptoms, and erratic behavior, including on the day of his death, and that, had Mr. Bucek been taking the appropriate medication, he wouldn't have behaved erratically on the day of his death.  To the extent that AHN disputes that these alleged breaches caused or contributed to Mr. Bucek's death, this goes to the weight of Dr. Cervantes's opinion and is more appropriate for a jury to decide. *See* ECF 81, pp. 13-14 (disputing Dr. Cervantes's opinion, that the delay in administering Abilify contributed to his death, as unsupported by medical evidence; arguing that Mr. Bucek was ingesting his medications because toxicology report revealed the presence of Citalopram).

## **CONCLUSION**

For the reasons discussed above, the County Defendants' motion for summary judgment (ECF 76) is **GRANTED**, and AHN's motion for summary judgment (ECF 80) is **DENIED**. A separate order follows.

DATED this 2nd day of July, 2025.


BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge

- 26 -